Filed 7/12/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HUE THI DANG MAI,<br><br>　　Cross-complainant and<br>　　Appellant,<br><br>　　v.<br><br>HKT CAL, INC., et al.,<br><br>　　Cross-defendants and<br>　　Respondents. | D076708<br><br><br><br>(Super. Ct. No. 37-2017-00009627-CU-OR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge. Affirmed in part; reversed in part with directions.

Mark Stuart Rosen for Cross-complainant and Appellant.

Blake Law Firm, Steven Wilson Blake and Danielle S. Ward for Cross-defendant and Respondent HKT Cal, Inc.

Manning & Kass, Ellrod, Ramirez, Trester, Rinat Klier-Erlich and Mark R. Wilson for Cross-defendant and Respondent Victoria Robinson.

---

\*　　Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part 6 of the Discussion.

Hue Thi Dong Mai was sued for breach of contract by a prospective purchaser of the apartment building she owned, a suit occasioned by fraudulent conduct on the part of Mai's real estate agent. The prospective purchaser ultimately dismissed the breach of contract action, and Mai invoked the "tort of another" doctrine in suing, by cross-complaint, the agent and her employer to recover the attorney's fees Mai incurred defending the contract action. In the course of that second phase of the litigation, Mai's counsel failed to appreciate the difference between presenting a claim for attorney's fees *as damages* at trial, and one for fees *as costs of suit* in a posttrial motion. By its own admission, the trial court shared in this confusion for a period of time.

Into this mix on the eve of trial, the cross-defendants submitted as dispositive authority the Court of Appeal decision in *Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1 (*Copenbarger*), which seemed to have the same effect as tossing a lit firecracker into the middle of a crowded dance floor. Acknowledging significant discomfort, the trial court apologized to Mai's counsel and reversed course on earlier tentative evidentiary rulings. Considering its hands tied by *Copenbarger*, the court decided it had no discretion to guide the case to what it believed was a fair resolution. Urging Mai to appeal the decision, it ultimately and regretfully concluded it could not award *anything* on her claim for attorney's fees.

Mai's appeal presents two issues. First, to what extent does *Copenbarger* accurately define the minimum showing required to sustain an award of attorney's fees as damages? Second, was the trial court correct in believing that *Copenbarger* eliminated its discretion to allow Mai to present her attorney's fee claim on the merits? As to the first issue, we believe *Copenbarger*'s analysis, some of which is dicta, may mislead trial courts by

2

causing them to disregard well-established and, in several instances, binding precedent that predates it. For that reason, we offer a narrow reading of *Copenbarger* that harmonizes it with other case authority to the extent that is possible. Regarding the second issue, even accepting *Copenbarger*'s analysis at face value does not, as the trial court here seemed to believe, eliminate all discretion the court possessed to make mid-trial adjustments and accommodations that respect defendants' right to a fair trial while also allowing plaintiffs to litigate the merits of their claims. Accordingly, we reverse and remand for a limited retrial on the issue of attorney's fees as damages in which the court can both apply the proper legal principles and exercise its discretion to achieve substantial justice between the parties.

FACTUAL AND PROCEDURAL BACKGROUND

In 2016, Mai was surprised to learn that John Fike was under the impression he had purchased an apartment building she owned. Although Mai listed the building for sale in 2015 and received an offer from Fike at that time, he never responded to her counteroffer. Then the building nearly sold to Dawn Oree, but the purchase fell through when Oree could not obtain financing. In the course of due diligence for that sale, Mai provided various documents about the building and her associated finances to her real estate agent, Victoria Robinson, to give to Oree.

Trusting Robinson with this information turned out to be a fateful decision. In late 2016, Robinson used her knowledge about Mai's building to arrange a fraudulent sale to Fike.[1] She forged Mai's signature on numerous documents, including the sales contract, and then tried to retroactively convince Mai to sell the property in a series of almost 60 increasingly

---

[1] Although Robinson's account differed, we recite the facts in accordance with the trial court's findings.

3

desperate text messages. Mai's single, firm response indicated she did not want to sell the building at that time.

Unfortunately, from Fike's perspective Robinson *qua* Mai had already done so. As a result, Fike sued Mai in 2017 for breach of contract and specific performance. Mai cross-complained, alleging various claims against Robinson and her employer, HKT Cal, Inc. doing business as Keller Williams Commercial (KW), including fraud as to Robinson and negligence as to both parties. After Mai's cross-complaint was filed, Fike added Robinson, KW and another individual as defendants in his action. He settled with those parties two years later and dropped his suit against Mai. In the meantime, however, she had been forced to defend the breach of contract claim. Mai's cross-complaint against Robinson and KW, which proceeded to trial, was primarily aimed at recovering the attorney's fees she paid to defend the Fike suit under the "tort of another" doctrine. She also sought recovery for emotional distress and punitive damages.

Following a bench trial, the court's written decision noted the stark inconsistencies and contradictions in the testimony. Mai claimed she never signed any documents pertaining to the sale of her property to Fike, while Robinson insisted she witnessed Mai sign the papers. The evidence ultimately convinced the trial judge that Robinson was not credible. In addition to a visible mismatch between Mai's authenticated signature and her supposed signatures on the sale contract and associated documents, the date of the text messages—in which Robinson pleaded with Mai to consider Fike's offer *days after* Mai allegedly signed the contract—and the fact that Robinson impersonated Mai to get information from her utility provider buttressed the court's conclusion that Robinson forged Mai's signature to orchestrate the fraudulent sale. She did all of this, apparently, to collect

4

what would have been a sizeable commission on a sale that exceeded $1 million and assuming she could convince Mai to agree to the transaction. In addition to these factual findings, the court also determined that Robinson breached her fiduciary duty to Mai. And while it found KW had no corresponding independent duty to Mai, the employer was nonetheless liable for Robinson's tort because she was acting under the broker's real estate license at the time.

As to damages, Mai was awarded $50,000 for emotional distress and $200 in punitive damages against Robinson—the latter paltry figure due to Robinson's minimal net worth. The court recognized that Mai's principal damage claim "was the attorney's fees caused by having to defend Fike's lawsuit," a sum she claimed was nearly $200,000. But it concluded it could not award Mai *anything* on this claim. The court reached this conclusion despite having "no doubt that work was done" and "attorney's fees . . . incurred." And it was convinced from an equitable perspective that "there ought to be a way to get at least some damages." But the court believed it was bound by the Court of Appeal decision in *Copenbarger*, *supra*, 29 Cal.App.5th 1, which it viewed as dictating that "Mai was unable to provide admissible evidence in support of her attorney's fees." Mai's primary contention on appeal is that the trial court erred in reaching this conclusion.

DISCUSSION

The principal issue in this case involves the recovery of attorney's fees as damages and the *Copenbarger* decision's restrictive view of how plaintiffs must offer proof of attorney's fees in such cases. We therefore begin with some helpful background regarding attorney's fees as damages, followed by a detailed summary of *Copenbarger* and a procedural description of the trial proceedings that demonstrates how fundamentally the trial court's

5

understanding of *Copenbarger* affected its view of this case and the ultimate decision it reached.

We go on to analyze various aspects of the *Copenbarger* holding in light of other relevant California authority—only some of which was considered by *Copenbarger*. Based in part on this broader focus, we restate the applicable legal principles that define the minimum showing necessary to support an award of attorney's fees as damages. These principles do not create the legal straightjacket that the trial court believed *Copenbarger* had constructed. Moreover, *Copenbarger* did not eliminate the trial court's ability and discretion to make mid-trial adjustments in procedure that would remedy what it considered a manifestly unfair result. We therefore reverse and remand for further proceedings. As to the remaining issues, we reject both KW's overly narrow framing of its own liability and Mai's contention that the trial court's punitive damages award was too low as a matter of law.

1.     *Background Information on Attorney's Fees as Damages*

In limited circumstances, it is permissible for plaintiffs to recover attorney's fees as damages. The claim that Mai made here—that she was forced to procure the services of an attorney to defend herself in the Fike suit as a result of Robinson's fraud—falls into one of these limited categories known as the "tort of another" theory.[2] While such doctrines are sometimes described as exceptions to the general "American rule" that each party pays for their own attorney's fees (see, e.g., *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505; *Flyer's Body Shop Profit Sharing Plan v. Ticor*

---

[2]     The tort of another doctrine allows for the recovery of attorney's fees as damages when a plaintiff is forced into litigation with a third party due to the tortious conduct of the defendant. (See *Prentice v. North American Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618 (*Prentice*); Rossi, Attorneys' Fees (3rd ed. 2021) Allowance of Fees as Damages, § 8:3.)

*Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1155), this characterization can be misleading. It is better to conceptualize these cases as claims for compensatory damages where the facts happen to permit the plaintiff to seek attorney's fees as a type of compensatory award. As our Supreme Court has stated, attorney's fees that are recoverable as damages function in "the same way that medical fees would be part of the damages in a personal injury action." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (*Brandt*).) In this context, an award of fees is "not really an 'exception' at all but an application of the usual measure of . . . damages." (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310 (*Sooy*).)

For that reason, it is critical to distinguish attorney's fees as damages "from 'attorney's fees *qua* attorney's fees.' "[3] (*Third Eye Blind, Inc. v. Near North Entertainment Ins. Services, LLC* (2005) 127 Cal.App.4th 1311, 1325.) Although this fundamental distinction has been described repeatedly (see *Brandt, supra*, 37 Cal.3d at p. 817; *Sooy, supra*, 220 Cal.App.3d at p. 1310), it persists in causing occasional confusion in both trial and appellate courts. But the distinction is far more than academic. It affects the burden that plaintiffs bear to produce evidence in support of their substantive claims, and it differs in significant ways from the requirements for a posttrial motion for fees as costs. (See Code Civ. Proc., § 1033.5, subd. (a)(10).)

That Mai was entitled to claim attorney's fees as damages due to Robinson's conduct is not in question here; neither cross-defendant challenges this general principle, or the trial court's factual findings that would support an award of these damages to Mai had she submitted—or been

---

[3]    Claims for attorney's fees as damages usually arise in tort or contract actions. (See, e.g., *Prentice, supra*, 59 Cal.2d 618 [tort] and *Copenbarger, supra*, 29 Cal.App.5th 1 [contract].)

7

allowed to submit—proper evidence of her fees.  To understand that
controversy, we turn now to the *Copenbarger* decision.  (*Copenbarger, supra,*
29 Cal.App.5th 1.)

2.      *The* Copenbarger *Case*

Like many cases where attorney's fees are sought as damages,
*Copenbarger* involved two disputes.  The first one was essentially a landlord-
tenant conflict that arose after Newport Harbor Offices & Marina, LLC
(Newport) ran into financial trouble and stopped paying its rent on a
commercial property it had subleased from Morris Cerullo World Evangelism,
Inc. (Morris Cerullo).  Morris Cerullo brought an unlawful detainer action
against Newport.  The Maag Trust, which had gained an interest in
Newport's lease, then joined the unlawful detainer suit as a defendant and
brokered a settlement agreement that included a promise from Morris
Cerullo to dismiss the unlawful detainer action.  (*Copenbarger, supra,* 29
Cal.App.5th at pp. 4–6.)

Shortly thereafter, Morris Cerullo tried to rescind the settlement
agreement and litigate the unlawful detainer action.  (*Copenbarger, supra,* 29
Cal.App.5th at p. 6.)  The Maag Trust responded by filing a breach of contract
claim against Morris Cerullo, commencing the second suit in the case.  While
the Maag Trust was attempting to enforce the settlement agreement, it
continued to defend the unlawful detainer action.  Three years later, Morris
Cerullo finally dismissed the detainer suit, and the Maag Trust sought as
breach-of-contract damages the attorney's fees it incurred defending the
unlawful detainer action during the three years between the settlement
agreement and the dismissal.  (*Id.* at pp. 6–7.)

After a bench trial, the Maag Trust was awarded attorney's fees as
damages based on:  (1) the testimony of its trustee, Lloyd Copenbarger, who

recalled being billed for approximately $118,000 in fees and paying about $90,000; and (2) the trial court's judicial notice of documents filed in the unlawful detainer action that reflected certain work performed by the Maag Trust's attorneys. (*Copenbarger, supra*, 29 Cal.App.5th at pp. 7–8, 11–13.) The Court of Appeal questioned both foundations for the award, ultimately concluding that the Maag Trust failed to prove damages for breach of the settlement agreement. *Copenbarger*'s substantive analysis begins with the principle that "[t]he plaintiff in a breach of contract action has the burden of proving nonspeculative damages with reasonable certainty." (*Id.* at p. 11.) The opinion then focused on the testimony of Lloyd Copenbarger, which it characterized as providing the only possible basis to support an award of attorney's fees as damages. According to the court, Copenbarger's testimony was legally insufficient for several reasons.

The court first addressed Copenbarger's testimony regarding the bills he received from his attorneys. It pointed out that he "did not bring the invoices with him to trial" and that his "testimony about the attorney invoices was inadmissible as hearsay and under the secondary evidence rule."[4] (*Copenbarger, supra*, 29 Cal.App.5th at pp. 12–13.) In any event, said the court, "[a]n invoice itself is hearsay, and is not admissible to prove the work or services reflected in the invoice were performed, unless a foundational showing is made of an exception to the hearsay rule." (*Id.* at p. 13, citing *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 43 (*Pacific Gas*).) It acknowledged the business records exception to the hearsay rule as a potential solution, but noted that

_____

4      Under the secondary evidence rule, oral testimony is generally inadmissible to prove the content of a writing. (See Evid. Code, § 1523, subd. (a).)

9

Copenbarger as the recipient of the invoice could not qualify "to testify as to [the invoice's] identity and the mode of its preparation." (*Copenbarger*, at p. 13.)

The court further determined that apart from the invoices, Copenbarger could not provide the evidence necessary to support an award of attorney's fees as damages. Specifically, he did not personally supervise the lawyers, did not know what legal services were performed, and could not distinguish between legal work on the unlawful detainer matter and work performed on the breach of contract action. In the court's view, this amounted to "a wholesale failure of proof." (*Copenbarger, supra*, 29 Cal.App.5th at p. 14.)

The *Copenbarger* opinion also considered the trial's court's decision to judicially notice the documents in the court file to supplement the evidence that legal work was performed in the unlawful detainer action, but concluded it did not save the Maag Trust's claim. Although the court did not directly address the propriety of judicial notice, it found that these court-filed documents had "little materiality" because " 'the truth of matters asserted in such documents is not subject to judicial notice.' " (*Copenbarger, supra*, 29 Cal.App.5th at pp. 14–15, quoting *Board of Pilot Commissioners v. Superior Court* (2013) 218 Cal.App.4th 577, 597.) According to the court, "The judicially noticed, court-filed documents are not relevant evidence of who prepared the documents, the amount incurred in attorney fees to prepare them, and whether that amount was reasonable." (*Copenbarger*, at p. 15.)

Finally, *Copenbarger* contrasted the Maag Trust's assertedly inadequate attempt to prove its attorney's fees with its view that these amounts could have been proved "quite easily" by providing a proper foundation for admitting the invoices as business records. Alternatively, "the

attorneys who represented the Maag Trust in the [unlawful detainer action] could have testified about their hourly rates, the work performed, and the amount of time spent on various tasks." (*Copenbarger, supra*, 29 Cal.App.5th at p. 15.) In the appellate court's view, "[s]uch evidence is required when a prevailing party requests attorney fees by motion [and] [n]o less is required when attorney fees are sought as damages." (*Ibid.*)

3.     *The Effect of* Copenbarger *on the Trial*

Returning to this case, it appears that at the outset, neither Mai's counsel, Mark Bagula, nor the trial judge appreciated the difference between "attorney fees sought *qua* damages and attorney fees sought *qua* costs of suit." (*Copenbarger, supra*, 29 Cal.App.5th at p. 9.) They were both under the impression that Bagula could file a posttrial motion for attorney's fees supported by one or more declarations with the relevant evidence.

The defense attorneys,[5] on the other hand, became aware at some point during the discovery process of the relevant distinction. In March 2019, at about the same time Fike was dismissing the unlawful detainer action, Bagula refused to turn over unredacted copies of Mai's bills from his firm, citing attorney-client privilege and attorney work product. Defense counsel responded that they needed the information and might have to seek an order compelling production from the trial court. But they never did so.

Several days before the trial began in early May, Bagula attempted to mark as trial exhibits some partially unredacted attorney billing records. Cross-defendants then filed a motion in limine to exclude the bills based on unfair surprise because Mai did not produce the unredacted versions during

_____

5     This litigation involved multiple parties. When we refer to the defense attorneys, we mean counsel representing both or either Robinson and KW, distinguishing when necessary.

11

discovery. Bagula responded with a "pocket brief," to which defense counsel replied, but the court did not consider these filings immediately because it was focused on other issues.

Although the defense brief cited *Copenbarger, supra*, 29 Cal.App.5th 1, Bagula and the trial court remained unaware of the details of the case; both were still under the impression that even if Mai could not introduce the unredacted bills into evidence, she could prove the amounts paid through her own testimony and generally support the damages claim in other ways.[6] But during Mai's direct examination, defense counsel objected to Bagula's attempt to do just that, claiming hearsay and citing *Copenbarger*.

It was only then, a few days into the trial, that the court thoroughly familiarized itself with the *Copenbarger* decision. And it then concluded, contrary to its earlier assumptions, that it could not allow Bagula to introduce the amount Mai paid in attorney's fees through her testimony. As the court summarized, "[*Copenbarger*] differs from the law as I understood it. We get fee motions all the time, and lawyers come in and they claim they have various hourly rates, and they claim they spent so much time, but on reasonableness, the Courts of Appeal always say, 'We defer to the experience of the trial judge,' and all of that. [¶] . . . [¶] And based on that, I assumed that I would be able, even without other evidence, knowing that this case was tried in front of me—I have motions in front of me. I know there was work done in this case—that I would be able to award some lawyer's fees, but this case seems to say otherwise. [¶] . . . [¶] That's different from my position last week . . . . [¶] . . . [¶] I was not aware of [*Copenbarger*] so I think, based on this, I have to sustain the [defense's] objections. [¶] . . . [¶] So I'm going to

---

6    Bagula argued, "She can say she received the bills, she can say she paid them, she can say how much she paid each month."

12

sustain the objection, but I encourage you [Mr. Bagula] to do something, because this is all counter intuitive to me."

Bagula continued to argue that getting the actual bills into evidence was not critical to his case. And once he realized the limitations that might be placed on Mai's testimony, he repeatedly asked the court to allow him to testify in order to authenticate the bills. Cross-defendants countered that it would be unfair to allow Bagula to add himself to the witness list so late, since they would have deposed him and prepared for a cross examination if they had earlier notice that he would testify. Apparently persuaded by these concerns, the court rejected Bagula's request. It also read *Copenbarger* as prohibiting the court from taking judicial notice of the pleadings and papers in the court file to provide at least some evidence of the work performed by Mai's attorneys.[7]

But the full impact of all of this seems to have dawned on the court only toward the end of the trial, when it came to the disturbing conclusion that Bagula's failure to turn over unredacted copies of the bills or list himself as a witness during discovery, coupled with its reading of *Copenbarger*, made it impossible to prevent a manifestly unfair result. As the court explained apologetically to Bagula before hearing closing arguments, it considered itself helplessly constrained:

> "Court: And for what it's worth, I read [*Copenbarger*] again and—I won't say what I want to say, but—
>
> "Bagula: Please do.

---

7    Referring to the appellate opinion, the court explained, "It says what the [trial] court tried to do in that case was take judicial notice of the file, which is what I had suggested early on, which seemed like a reasonable thing for me to do. And I could look at least at the pleadings and then infer from that some reasonable value of the services. The appellate court in [*Copenbarger*] specifically said I couldn't do that."

13

"Court: I would—based on the decision that I'm going to make, I strongly—assuming I find liability, strongly urge you to appeal. But I just think you're barred. I think, under our rules and everything, the failure to disclose, and the court goes on about that—you know, that even any testimony about what's in the bills could be secondary evidence. So the bills are critical. I wasn't focused on that, but the—in other words, the best—what we always—used to say is best evidence is the bills themselves. And you need to lay—and there's—there's no way Mai could lay a foundation of that. [¶] And with my ruling that your failure to list on any of the pretrial, the TRC report, or your list of evidence, your list of witnesses, any of that, somebody to lay the foundation, I think I'm bound by that case. . . . I mean [it is] a horrible case for a plaintiff.

"Bagula: Yes, Your Honor.

"Court: And—but I think I'm bound by it.

"Bagula: I understand the Court's decision. . . .

"Court: Yeah. And I—I'll be honest, I did everything I could. Because it seems to me if there—if I do find liability— . . . there ought to be a way to get at least some damages. [¶] And there's no question that if there was a forgery, that was the cause of the lawsuit, which caused the attorney's fees. I have no doubt that attorney's fees were incurred. I have no doubt that work was done. But under [*Copenbarger*], I—I can't—I have to follow it. I want the record to be very clear on that. . . . [¶] . . . [¶] So you—you know, I—I like to do the right thing, but sometimes I can't."

Several specific comments the court made in this final exchange are worth highlighting. First, the court mentioned that although the attorney's bills were critical, it had not focused on that issue earlier, implying it did not appreciate the full weight of its decision to exclude the partially unredacted bills when it did so. Second, it commented that Bagula's failure to identify a witness who could authenticate the bills, understood in light of *Copenbarger*, bound the court to an outcome that it considered manifestly unfair.

14

Even more critically, the court said that it did "everything [it] could" and thought "there ought to be a way to get at least some damages" if it found liability, which it went on to do in its statement of decision. This commentary is telling, because it demonstrates that the court misunderstood the scope of its own discretion. The precise manner in which the court interpreted *Copenbarger* to limit its inherent ability to address errors that arose *during litigation* is not entirely clear. But it seems to have read that case—which assessed evidentiary errors after the fact—as precluding it from doing anything to mitigate similar problems that arose in the midst of an ongoing trial.

As we explain in further detail below, the facts of this case differ in several respects from those in *Copenbarger*. Moreover, we question certain of *Copenbarger*'s legal conclusions in light of existing precedent that the opinion either failed to consider or gave insufficient weight to. Finally, even assuming that *Copenbarger*'s analysis was correct, it need not have been interpreted by the trial court as constraining it from exercising its considerable discretion to guide the trial to a fair result.

4.    *How Much Evidence Is Enough to Support a Claim for Damages?*

We now proceed to consider the plaintiff's prima facie burden in an attorney's-fees-as-damages case and the trial court's decision here that Mai could not meet that burden. Although they arise in different procedural contexts, the fundamental issue in both this case and *Copenbarger* is the same: What is the minimum amount of evidence necessary to sustain an award of attorney's fees as damages? It is, in effect, as though defendants made a motion for partial nonsuit at the close of plaintiff's case and the trial court was called upon to decide whether the plaintiff would even be permitted

15

to argue attorney's fees as damages. Reading *Copenbarger* as entirely dispositive, the trial court here effectively granted a partial nonsuit.

In reversing a trial court judgment for insufficient evidence, *Copenbarger* made certain assumptions about what was required to meet a plaintiff's prima facie burden and, in the absence of other evidence from the defendant, sustain a judgment in plaintiff's favor. Although it made a point of distinguishing between attorney's fees *as damages at trial* and attorney's fees recoverable *as costs in a postjudgment motion*, *Copenbarger* assumed that the requirements for obtaining fees in both contexts were the same. It cited certain rules for attorney's fee motion practice and concluded that because "[s]uch evidence is required when a prevailing party requests attorney fees by motion [and] [n]o less is required when attorney fees are sought as damages."[8] (*Copenbarger, supra*, 29 Cal.App.5th at p. 15.)

Having surveyed the law with regard to a plaintiff's prima facie burden *at trial* to prove damages, we question this assumed equivalence. In our view, the considerations are quite different when reviewing a judgment following a full trial, as opposed to a postjudgment motion where most or all the evidence is presented by declaration. Moreover, it is difficult to justify a different rule for proving attorney's fees than would apply to other similar expenses recoverable as damages. Rather than looking to the standards governing posttrial motions for attorney's fees, as *Copenbarger* did, we find more helpful guidance in the general principles governing a plaintiff's burden of production to establish compensatory damages.

---

[8] *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315 and *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, both relied on by *Copenbarger*, involved motions for attorney's fees under Code of Civil Procedure section 425.16, subdivision (c). (*Copenbarger, supra,* 29 Cal.App.5th at p. 15.)

16

The plaintiff's responsibility in making a preliminary showing of medical expenses in personal injury cases provides a helpful starting place, since it constitutes a close analogue: " 'When a pedestrian is struck by a car, he goes to a physician for treatment of his injuries, and the motorist, if liable in tort, must pay the pedestrian's medical fees. Similarly, . . . an insurance company's refusal to pay benefits has required the insured to seek the services of an attorney to obtain those benefits, and the insurer, because its conduct was tortious, should pay the insured's legal fees.' " (*Brandt, supra*, 37 Cal.3d at p. 817.) Phrasing the *Brandt* principle for broader application on the facts of our case, where a defendant's conduct requires the plaintiff to incur attorney's fees in prosecuting or defending a lawsuit (generally involving a third party), the defendant should pay the plaintiff's legal fees.

To support a claim for medical expenses as damages, plaintiffs must demonstrate the amount of each claimed expense. (Haning et al., California Practice Guide: Personal Injury (2020) Damages, ch. 3-C, §§ 3:350–3:351.) Beyond this, plaintiffs must also show the expenses were reasonable and incurred as a result of injuries caused by the defendant. (*McAllister v. George* (1977) 73 Cal.App.3d 258, 264 (*McAllister*); *Gimbel v. Laramie* (1960) 181 Cal.App.2d 77, 81 (*Gimbel*).) Testimony that they paid the cost of medical treatment for injuries caused by the defendant is sufficient evidence that such costs were reasonable, and satisfies the plaintiff's initial burden of production.[9] (*Malinson v. Black* (1948) 83 Cal.App.2d 375, 379 (*Malinson*).)

---

[9] As we later explain, submission of an actual invoice can corroborate such testimony. But it is not a necessary component of the plaintiff's case. (See *Moore v. Mercer* (2016) 4 Cal.App.5th 424, 446 [approving of a plaintiff's summaries of medical bills as "an efficient manner of presenting the evidence to the jury and, in the absence of an objection or evidence to the contrary, [enough to] sustain[ ] plaintiff's burden of proving her damages"].)

Similar standards govern other cases involving damage to property. (See, e.g., *Laubscher v. Blake* (1935) 7 Cal.App.2d 376, 383 [finding the cross-complainant's evidence that he paid a certain amount to repair his car in an accident caused by the defendant sufficient to support the award of damages].) We see no reason why the same principles should not apply in any case where the plaintiff pays for professional services to deal with the consequences of the defendant's unlawful action, and then seeks to recover those costs as compensatory damages against the defendant. A prima facie case as to the costs incurred and their reasonableness can be established by the plaintiff's testimony that bills for the services were paid.[10]

With these considerations in mind, we consider several aspects of the *Copenbarger* opinion that convinced the trial court Mai could not meet her burden of production. Analyzed in light of the rules that apply to proving damages generally, we discuss why the concerns expressed in *Copenbarger* did not necessarily preclude Mai from proving the necessary elements of her damage claim.

---

[10] What it takes for plaintiffs to make an initial showing to support their damages is, of course, distinct from the greater burden a plaintiff must carry if their case is challenged by the defense. Plaintiffs with challenged medical costs often rely on the testimony of their treating physician to further support their claim of damages. (See *Pebley v. Santa Clara Organics, LLC* (2018) 22 Cal.App.5th 1266, 1278–1280.) In the same manner, a plaintiff with challenged legal costs can rely on the testimony of their attorney to authenticate any invoices offered, explain why certain tasks were performed, and further support the reasonableness of those costs. This kind of testimony is permitted by the State Bar. (Rules Prof. Conduct, rule 3.7(a)(2).)

a. *Under established Supreme Court precedent, invoices are admissible to support a plaintiff's testimony that certain amounts were paid and provide a prima facie showing that the amounts were reasonable.*

Absent testimony from the lawyers themselves, *Copenbarger* can easily be read to require that plaintiffs offer their actual invoices for attorney's fees in order to support any claim for the amounts paid as damages.[11] (*Copenbarger, supra,* 29 Cal.App.5th at p. 15.) The analysis in *Copenbarger* at least suggests that the only proper way to do this is to first authenticate the bills with a competent witness, submit them as exhibits, and then call the plaintiff to testify that the bills were paid. Anything less, the decision seems to warn, will subject the plaintiff to insurmountable hearsay and/or secondary evidence rule objections. Indeed, that reading of *Copenbarger* was the genesis of much of the confusion in this case.

But interpreting *Copenbarger* in this manner would create a conflict with Chief Justice Traynor's opinion for the Supreme Court in *Pacific Gas, supra,* 69 Cal.2d 33, which established what has been called a hearsay exception for invoices: "Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for repairs was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of *these documents may be admitted for the limited purpose of corroborating his testimony* [citations]*, and if the charges were paid, the testimony and documents are evidence that the charges*

---

11    We use the terms "invoices" and "bills" interchangeably throughout, and broadly mean these terms to also include receipts and any other documentation prepared to show proof of payment.

*were reasonable.*"[12]  (*Pacific Gas,* at pp. 42–43, italics added.)  In other words, once the plaintiff testifies (based on personal knowledge) that a bill in a particular amount was received and paid, the invoice itself can be introduced to explain and support the plaintiff's testimony as well as show the amount was reasonable.  (*Ibid.* ["Since there was testimony in the present case that the invoices had been paid, the trial court did not err in admitting them."].)

This theory of admissibility is justified by the "recognition that a person who receives a bill has 'every interest to dispute its accuracy or reasonableness if there is reason to do so.  Thus, if a bill or invoice is paid, the court is assured of the accuracy and reasonableness of the charges.' " (*Dumrichob, supra*, 63 Cal.App.4th at pp. 1267–1268.)  But even as it approved the admissibility of invoices to support a plaintiff's testimony as to amount and reasonableness of expenditures caused by the defendant's conduct, *Pacific Gas* explained that the detailed content of invoices could not be read to the trier of fact and then used to prove *what* exactly had been done.  This would be using the invoices to prove the truth of the matter recited in the invoice and thus violate the hearsay rule.  As Chief Justice Traynor explained, "[t]he individual items on the invoices" could not be read

---

12    The Court of Appeal decision in *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258 (*Dumrichob*) refers to *Pacific Gas* as creating "a narrow but long-recognized exception to the hearsay rule." (*Dumrichob*, at p. 1267.) Later commentators suggest that invoices are really admitted for a nonhearsay purpose.  (See Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2020) ¶ 8:1025 ["bills for services rendered may be admissible for *nonhearsay* purposes; e.g., to corroborate testimony that a party incurred the liability, or to show that the charges were reasonable"].)

"to prove that these specific repairs had actually been made." (*Pacific Gas, supra*, 69 Cal.2d at p. 43.)[13]

Although *Pacific Gas* dealt with repair costs for a turbine (*Pacific Gas, supra*, 69 Cal.2d at p. 36), the principle it announced can fairly be applied to costs incurred for a wide variety of goods and services. Indeed, it has been invoked broadly to permit the receipt of invoices for dental work, refunds for diseased cattle, and bills for expert witnesses. (See, respectively, *McAllister, supra,* 73 Cal.App.3d at p. 263, *Imperial Cattle Co. v. Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263, 272, and *Dumrichob*, *supra*, 63 Cal.App.4th at p. 1267.)

*Copenbarger* cites *Pacific Gas, supra*, 69 Cal.2d 33 for the general proposition that "[a]n invoice itself is hearsay . . . unless a foundational showing is made of an exception to the hearsay rule" (*Copenbarger, supra*, 29 Cal.App.5th at p. 13), but does not acknowledge the *Pacific Gas* holding that invoices are admissible over a hearsay objection. It also did not consider or discuss *Malinson, supra,* 83 Cal.App.2d 375, which held that when a plaintiff testifies certain costs were paid,[14] such testimony not only provides some

13  Here, relying on *Copenbarger*, the trial court properly ruled that the "individual items on the invoices"—the detailed descriptions of the legal work performed—were inadmissible hearsay and could not satisfy Mai's burden.

14  The rule for *unpaid* bills is less certain, and at a minimum is up for debate. (Compare the suggestion in *Malinson, supra*, 83 Cal.App.2d at p. 379 that expenses incurred would be "some evidence of reasonable value" regardless of the payment status with commentary to the contrary in *Latky v. Wolfe* (1927) 85 Cal.App. 332, 347, *Linde v. Emmick* (1936) 16 Cal.App.2d 676, 684, and *Gimbel, supra,* 181 Cal.App.2d at p. 81; see also *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120, 138 [concluding that unpaid *medical* bills do not reflect the reasonable value of services provided, relying on cases that explain the idiosyncratic nature of billing in the medical context].)

evidence that the costs were reasonable but, "in the absence of contradictory testimony, will be held sufficient to support the award" of damages. *Malinson* drew from an early Supreme Court case, *Dewhirst v. Leopold* (1924) 194 Cal. 424, 433 (*Dewhirst*), for this proposition and has since been followed on this point by other appellate courts.[15] (See, e.g., *People v. Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 606; *Plonley v. Reser* (1960) 178 Cal.App.2d Supp. 935, 938.)

Of course, the plaintiff in *Copenbarger* never sought to introduce the invoices as evidence, so the opinion's discussion of their admissibility is technically dicta. In any event, we decline to read *Copenbarger* as conflicting with binding precedent from our Supreme Court. We are thus of the opinion that its commentary on the inadmissibility of the invoices would only apply to cases where plaintiffs attempt to read the detailed entries on the bills during their testimony to prove the specific repairs made or services rendered—and not where the invoices are offered for the more limited and appropriate purpose of corroborating testimony that they actually paid certain amounts and/or to make a prima facie showing that the charges were reasonably incurred.[16]

As pertinent to this case, Mai sought to introduce redacted copies of the attorney invoices only to support her testimony that she paid the billed amounts and as some evidence that the amounts were reasonable.[17] This

---

[15]    Both *Malinson* and *Dewhirst* are cited with approval in *Pacific Gas, supra,* 69 Cal.2d at page 43.

[16]    Such testimony would not violate the secondary evidence rule since is it not offered to prove the content of the writing. (Evid. Code, § 1521.)

[17]    Defendants argue that Mai's failure to provide unredacted billing records until the eve of trial prejudiced their right to effectively cross-

approach is specifically permitted by *Pacific Gas*. The trial court erred in broadly reading *Copenbarger* to preclude both Mai's testimony and receipt of the invoices for these limited and appropriate purposes. This evidence would have satisfied Mai's prima facie burden to establish how much she paid for legal services and the reasonableness of that amount.

> b. *Judicial notice of attorney-prepared documents in the court file was an available means to provide some evidence of the legal work that was performed.*

In addition to showing what was paid to her attorneys and a basis to conclude that these amounts were reasonable, Mai was also obligated to provide some evidence of the work that was performed on her behalf. (See *California Steel Bldgs., Inc. v. Transport Indem. Co.* (1966) 242 Cal.App.2d 749, 760 [to sustain a damages award plaintiff must provide "*some* evidence

---

examine her regarding her attorney's fees. (See *Copenbarger, supra*, 29 Cal.App.5th at p. 15.) Mai responds by voicing her concern that the protections of the client-attorney privilege are impermissibly undermined if a plaintiff bringing a claim for attorney's fees as damages is required to disclose bills during discovery. As we have explained, there is no general requirement that invoices are necessary to support a claim for damages based on repairs or other expenses incurred by the plaintiff. Indeed, the redacted bills here avoided the hearsay problem highlighted in *Pacific Gas* that prevents a plaintiff from reading the detailed entries on an invoice. To the extent defendants are complaining that they needed unredacted bills to prepare their defense, their remedy was to file a motion to compel the production of the documents. To the extent that Mai's concerns about balancing privileged communications with discovery obligations remain, we note that the trial court's power to control the order of evidence (Evid. Code, § 320), set the order of trial as to any distinct issue (Code Civ. Proc., § 598), limit the scope of discovery (Code Civ. Proc., § 2017.020), and limit the scope of depositions (Code Civ. Proc., § 2025.420), all provide critical protections to ensure a fair balance of the rights of the litigants. (See also *Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1620 [noting courts can order documents produced with any necessary redactions to protect privileged information].)

of the nature and extent of the services rendered" (italics added)].)  Although this is not a heavy burden, defendants contend she failed to introduce *any* evidence of what legal services were performed.  In this regard, they maintain that Mai is just like Lloyd Copenbarger.  She did not supervise the legal work and knew nothing of what the attorneys actually did.  (See *Copenbarger, supra*, 29 Cal.App.5th at p. 14.)  They further rely on *Copenbarger* as precluding judicial notice of the court file in the Fike action to support Mai's claim.  (*Id*. at pp. 14–15.)  Defendants conclude that, just as in *Copenbarger*, "[n]o admissible evidence was presented of the nature of the legal work performed."  (*Id*. at p. 14.)

We begin by observing that *Copenbarger* expressly did not decide whether judicial notice of the pleadings and other documents in the court file was error.  (*Copenbarger, supra*, 29 Cal.App.5th at p. 14 ["We do not address that argument."].)  Instead, it concluded that the documents in the court file "have little materiality" to the question of what legal work was performed in previous litigation.  (*Ibid*.)  *Copenbarger* appears to be concerned that taking judicial notice of attorney-prepared documents in the court file to show the nature of the legal work performed would involve " 'the truth of matters asserted in such documents [which] is not subject to judicial notice.' "  (*Id*. at p. 15.)  But it is not the truth of the statements in the pleadings and briefs that makes them relevant.  Rather, papers from previous litigation are evidence that legal work was performed on a litigant's behalf.  What imbues them with evidentiary value is the fact that they constitute the work product of the attorney of record working for the plaintiff in the prior suit.

Notwithstanding *Copenbarger*'s disinclination to decide the issue, case law is quite clear that the court *can* take judicial notice of documents in the court file.  (Evid. Code, § 452, subd. (d); *Heston v. Farmers Ins. Group* (1984)

24

160 Cal.App.3d 402, 413 [briefs filed in court are subject to judicial notice].) More importantly, judicial notice of such documents is proper for the specific purpose of establishing "the nature and extent of [legal] services." (*Estate of Fulcher* (1965) 234 Cal.App.2d 710, 719 (*Fulcher*).)

The case of *Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051 (*Bruckman*) is a particularly pertinent application of this general principle. There, the plaintiff was forced to incur attorney's fees in prosecuting a quiet title action as a result of the negligence of the defendant title insurer. In the subsequent negligence action, the plaintiff sought the fees incurred as damages and attempted to prove them through "exhibits containing statements from his attorneys in that action, cancelled checks and his testimony." (*Id.* at p. 1061.) In addition, at plaintiff's request, the court took judicial notice of the documents in the court file of the quiet title action "for the purpose of substantiating his claim of damages and to familiarize the court with the complexity and extent of the litigation." (*Ibid.*) Finding "no error in this procedure," the appellate court affirmed the damages award, finding that "the amount was reasonable and that the damages had been proved with reasonable certainty." (*Ibid.*)

In this case, Mai suggested the trial court could take judicial notice of the documents filed by her attorneys in the Fike suit and the trial judge initially expressed his willingness to do so. Moreover, he was personally familiar with this material since he had presided over that matter as well.

But he changed his decision later on because he read *Copenbarger* as precluding resort to judicial notice for this purpose.[18]

It was a mistake for the trial court to read *Copenbarger* as barring this established use of judicial notice. To be fair, *Copenbarger* strongly implies—though it does not hold—that the kind of judicial notice approved of in *Bruckman* and *Fulcher* is improper. Insofar as *Copenbarger* is inconsistent with these opinions, we disagree with its conclusions. The sounder and long-established rule is that materials filed by attorneys on behalf of litigants can be judicially noticed and provide evidence to support an award of attorney's fees. As relevant to this case, the materials filed on Mai's behalf by her attorneys in the Fike action were properly subject to judicial notice and provide *some* evidence of the work performed defending that case.[19]

5.    *The Trial Court's Misunderstanding of Its Own Discretion*

Consistent with the general rules that apply to the proof of damages at trial, we have explained why Mai's testimony and the attorney invoices, combined with attorney-prepared documents in the court file of which the

---

18    *Copenbarger* also suggests that court-filed documents "are not relevant evidence of who prepared the documents, the amount incurred in attorney fees to prepare them, and whether that amount was reasonable." (*Copenbarger, supra*, 29 Cal.App.5th at p. 15.) But in this case, the purpose of judicial notice was not to prove the amount of attorney's fees or their reasonableness. Mai's testimony was admissible to do that. As to "who prepared the documents," both Mai's testimony and the court file could establish the lawyer or firm who served as Mai's attorney of record during the relevant time period.

19    In this case, to say the Fike filings provided *some* evidence of the work performed by Mai's attorneys is not to say they would necessarily support an award of the full billed amount. But the trial court here concluded it was without authority to award Mai *anything* for attorney's fees based in part on its belief that *Copenbarger* precluded judicial notice of the court file. For the reasons already explained, this conclusion was manifestly incorrect.

court could take judicial notice, would have provided a sufficient basis to support an award of attorney's fees as damages. But even if the trial court read *Copenbarger*'s comments on hearsay, the secondary evidence rule, and judicial notice as a holding that this combined evidence was insufficient as a matter of law, we need to explain why a court coming to this realization in the middle of trial was still empowered to guide the proceedings to what it considered to be a fair resolution.

This is because of the critical difference in procedural posture of the two cases. *Copenbarger* was assessing evidentiary errors *after* a trial concluded and judgment had been entered, whereas the trial court in this case was presiding over an active trial when its understanding of the governing law materially changed. If it now believed Mai was obligated to prove her damage claim through the testimony of her attorney who could authenticate unredacted invoices as business records, it could have paused the proceedings. Under its inherent powers, it could have granted a continuance, ordered unredacted copies of the attorney's bills to be provided to the defendants, and then allowed the defendants to depose Bagula before he was added to the witness list. This would have mitigated any prejudice to the defendants and avoided the substantially unfair outcome that the court later lamented—gutting Mai's ability to present her case. It also would have been a comparatively simple option since this was a bench trial and involved no jurors.

While such an interruption in proceedings would undoubtedly be unusual, it is surely preferable to a court continuing to preside over a trial that leads inevitably to a result the judge considers unfair and erroneously thought was beyond his power to remedy. Courts possess the inherent power to continue matters before them. (*Curtis v. Underwood* (1894) 101 Cal. 661,

27

669; Eclavia et al., California Jurisprudence (3rd ed. 2021) § 283.) And while delaying litigation is generally disfavored in light of efficiency concerns (Gov. Code, § 68607), those concerns are secondary to the primary function of the courts—to adjudicate disputes on their merits. "[D]ecisions about whether to grant a continuance or extend discovery 'must be made in an atmosphere of substantial justice. When [efficiency and fairness concerns] collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency.'" (*Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, 1246; see also Cal. Rules of Court, rule 3.1332(d)(10) [courts consider the interests of justice in weighing a request for a continuance].) Avoiding reversal on appeal is also the more efficient option, even when it causes trial delays.

Here, the court's comments late in the trial, which it took pains to put on the record, persuade us that it did not consider itself authorized to avoid both an unfair result and the evidentiary minefield seeded by its reading of *Copenbarger*. It believed itself doomed to either repeat the mistakes of the trial judge in *Copenbarger* or bar the admission of any and all evidence that would have supported Mai's damages—even though that evidence was readily available and she attempted to offer it.

That the court thought it was so constrained suggests that it misunderstood the scope of its own discretion. While the court's evidentiary decisions merit deference and generally will not be disturbed on appeal unless an abuse of discretion occurred, "an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion." (*People v. Marquez* (1983) 143 Cal.App.3d 797, 803.) For this reason as well, we remand for a retrial on the narrow issue of attorney's fees as damages at which the trial court can exercise the full range of its discretion in resolving

28

any remaining discovery issues. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801 (*Brewer*) ["The appellate courts have power to order a retrial on a limited issue, if that issue can be separately tried without such confusion or uncertainty as would amount to a denial of a fair trial."].)

6.     *Additional Issues*

Two issues remain for our resolution. The first involves the scope of KW's liability for Robinson's actions. KW argues that even if the evidence was sufficient to support an award of attorney's fees as damages, it cannot be held liable for Mai's attorney's fees in the Fike suit under the tort of another doctrine because only Robinson—not KW—committed a tort against Mai. But this argument merely ignores respondeat superior as a theory of liability. It further ignores the trial court's explicit finding that KW was liable for *Robinson's* actions on those grounds. KW cites no case authority for its implied position that respondeat superior is inappropriate here, and the case on which the trial court relied, *Alhino v. Starr* (1980) 112 Cal.App.3d 158, indicates otherwise. (*Id.* at pp. 174–175.) Since KW advanced no legal argument on this point, we need consider the issue no further. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."].)

The final issue we must resolve is whether, as Mai claims, the trial court's $200 award of punitive damages assessed against Robinson was too low as a matter of law. Mai asserts that the trial court's focus on Robinson's low net worth, which it found to be $1,000, was inadequate, and that it

should have allowed inquiry into[20] and considered her future earning potential in its decision.  But she cites no caselaw that mandates such a process.

When challenged, punitive damages are generally reviewed for excessiveness, which implicates due process concerns.  (12 Miller & Starr, California Real Estate (4th ed. 2021) § 40:93.)  In that context, appellate courts apply de novo review, and consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 409 (*State Farm*).)

But a low punitive damages award does not create an "acute danger of arbitrary deprivation of property" as an excessive award does.  (*State Farm, supra*, 538 U.S. at p. 417.)  And because a "plaintiff is never entitled to punitive damages as a matter of right," the award amount is a "question[ ] committed to the trier of fact"—in this case, the trial court.  (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 923–924; see also Civ. Code, § 3294, subd. (a) [plaintiff "may" recover punitive damages].)  In this context, where no constitutional concerns as to the defendant nor right of recovery as to the plaintiff animate our review, we give substantial deference to the court's judgment.

In assessing a punitive damages award, there is no "rigid standard for measuring a defendant's ability to pay."  (*Adams v. Murakami* (1991) 54

---

[20]  Contrary to Mai's assertion that she was limited to inquiring about Robinson's *current* net worth, the trial court also allowed questions regarding her net worth (though not her income) in previous years.

Cal.3d 105, 116, fn. 7.)  Net worth is the most common measure of wealth used, and although the trier of fact is permitted to look beyond net worth, it is by no means required to do so.  (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621.)  Neither is there some] proportionality requirement between the award of compensatory and punitive damages (absent a potentially excessive award).  (*Brewer, supra*, 32 Cal.2d at p. 802 ["The rule that exemplary damages must bear a reasonable relation to actual damages [citations] is designed solely to guard against excessive punitive damages."].)

As a general rule, punitive damage awards beyond ten percent of a defendant's net worth run the risk of being deemed excessive.  (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 81; *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1163 [10 percent of net worth is a generally recognized "cap" on punitive damages].)  Here, the trial court considered Robinson's low net worth and set the damages at twenty percent. While the actual figure is modest, it appears the court doubled the general cap in order to carry out the purpose of a punitive award—to punish the wrongdoer and deter future bad acts.  (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13.)  Mai has made no showing that the trial court abused its discretion in doing so.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for retrial on the limited issue of attorney's fees as damages in accordance with this opinion. In all other respects, the judgment is affirmed. Mai is entitled to costs on appeal.

DATO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.

32